IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| JENNIFER O.[1], | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 7:21-cv-00040 |
| | ) |
| KILOLO KIJAKAZI[2], | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

### REPORT AND RECOMMENDATION

Plaintiff Jennifer O. ("Jennifer") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding her not disabled and therefore ineligible for Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Jennifer alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) determine her RFC, including by using a function-by-function analysis; (2) assess her mental impairments; and (3) assess her allegations regarding her symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 16) and **DENYING** Jennifer's Motion for Summary Judgment (Dkt. 14).

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is hereby substituted for Andrew Saul as the defendant in this case.

**STANDARD OF REVIEW**

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Jennifer failed to demonstrate that she was disabled under the Act.[3] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

**CLAIM HISTORY**

Jennifer filed for DIB benefits in June 2018, claiming that her disability began on April 14, 2018, due to narcolepsy, difficulty concentrating and focusing, severe fatigue, severe daytime

---

[3] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

sleepiness, medication side effects, restless leg syndrome/cramping, depression, and anxiety.[4] R. 17, 106. Jennifer's date last insured is December 31, 2023[5]; thus, she must show that her disability began on or before this date and existed for twelve continuous months to receive DIB. R. 12; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied Jennifer's claims at the initial and reconsideration levels of administrative review. R. 90–102, 105–17. ALJ Thomas W. Erwin held a hearing on February 26, 2020 to consider Jennifer's claim for DIB, where vocational expert Barry Hensley testified, and Jennifer was represented by counsel. R. 62–89. After the hearing, the ALJ requested medical interrogatories from John Pella, M.D. and Michael Lace, Psy.D., and then held a supplemental hearing on July 29, 2020. R. 39–59. On August 18, 2020, the ALJ entered his decision considering Jennifer's claim under the familiar five-step process[6] and denying her claim for benefits. R. 17–31.

The ALJ found that Jennifer suffered from the severe impairments of narcolepsy, thyroid disorder, myalgias, obesity, depression, and anxiety. R. 20. The ALJ determined that these impairments, either individually or in combination, did not meet or medically equal a listed

---

[4] Jennifer was 52 years old on her alleged onset date and 54 years old on the date of the ALJ's decision, making her an individual closely approaching advanced age (ages 50-54). R. 90

[5] At the administrative levels of review, Jennifer's date last insured was indicated as December 31, 2022. R. 105.

[6] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the RFC, considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

3

impairment. R. 20. The ALJ specifically considered listing 1.02 (major joint dysfunction), listing 11.02 (epilepsy), listing12.04 (depressive, bipolar, and related disorders), and listing 12.06 (anxiety and obsessive-compulsive disorders). R. 20–21. The ALJ also considered Jennifer's obesity in accordance with SSR 19-2p. R. 21. The ALJ found that regarding her mental impairments, Jennifer had mild limitations in understanding, remembering, or applying information, interacting with others, and adapting or managing herself, and moderate limitations in concentrating, persisting, or maintaining pace. R. 21–23.

The ALJ concluded that Jennifer retained the residual functional capacity ("RFC") to perform a limited range of medium work. R. 24. Specifically, Jennifer can have no exposure to hazards, unprotected heights, or driving, and cannot perform production rate or pace work, defined as assembly-line type work or other work with strict daily quotas. Id. Jennifer cannot perform jobs with repetitive "same tasking" all shift and, due to narcolepsy, the work should "consider a later starting time, such as 9-10 in the morning, or be shift work." R. 24. The ALJ determined that Jennifer was unable to perform her past relevant work as a human resources assistant, but that she could perform jobs that exist in significant numbers in the national economy, such as laundry sorter, ticket taker, and brewery worker. R. 30–31. Thus, the ALJ determined that Jennifer was not disabled. R. 31. Jennifer appealed and the Appeals Council denied her request for review on December 18, 2020. R. 1–3.

## **ANALYSIS**

Jennifer alleges that the ALJ failed to properly determine her RFC, including by using a function-by-function analysis, and failed to properly assess both her mental impairments and her allegations regarding her symptoms.

A. **Medical History Overview**

Jennifer has a history of narcolepsy, dating from before her alleged disability onset date, and which was generally treated with Adderall and Xyrem. R. 347, 350. In August 2018, a few months after her alleged onset date, Jennifer reported "significant decline" to her neurologist, Clement Elechi, M.D., since her last visit in February 2018, including memory issues[7], poor nighttime sleep, and excessive daytime sleepiness, as well as side effects from her Xyrem medication, causing her to taper off the medication. R. 387. At a follow-up in April 2019, Jennifer reported significant sleepiness in the early part of the day, getting better after 1:00 p.m., and Dr. Elechi advised her to use Xyrem more consistently, and try drinking more caffeine. R. 413–14. By October 2019, Jennifer complained of fluctuating symptoms, and continued side effects from Xyrem, and Dr. Elechi advised her to taper of Xyrem, after which he would "consider if some other hypnotic would be helpful" and also advised "timed scheduled naps." R. 410. At her follow-ups in April and July 2020, Jennifer continued to report poor nocturnal sleep and excessive daytime sleepiness. R. 525, 527.

At appointments with her family doctor during the relevant period, often for hormone replacement therapy follow-ups, Jennifer had tenderness on physical exam, but was otherwise generally normal, with normal strength, gait, sensation, and reflexes. R. 364, 367, 423, 427, 434, 449, 458, 469, 500. Regarding her mental health, Jennifer presented for an initial mental health evaluation for depression and anxiety in August 2018 and was diagnosed with situational depression and anxiety. R. 403. At follow-up appointments in October and November 2018 and January and February 2019, Jennifer reported feeling, distressed, anxious, and worthless,

---

[7] Jennifer reported that she had been unable to complete the training at a new job due to these memory issues. R. 387.

including frustrations with her narcolepsy symptoms, and the psychologist noted Jennifer's functioning as fair to poor. R. 398–404.

1. Medical Opinions

In October 2018 and February 2019, state agency psychologists Eric Oritt, Ph.D. and Andrew Bockner, MD., reviewed the record and both determined that Jennifer had moderate limitations in understanding, remembering, and applying information, interacting with others, and concentrating, persisting, or maintaining pace, and mild limitations in adapting or managing oneself. R. 95, 111. They found Jennifer could perform short, simple instruction, with an occasional need for accommodations during a normal workweek and would perform best if in a well-spaced location, with few co-workers and only brief interaction with the public. The ALJ found these opinions partially persuasive. Also in October 2018 and February 2019, state agency doctors James Darden, M.D. and Jack Hutcheson, M.D. reviewed the record and determined that Jennifer had no exertional or postural limitations, but should avoid even moderate exposure to hazards due to her narcolepsy. R. 98, 113. The ALJ also found these opinions to be partially persuasive. R. 29.

On March 7, 2020, at the ALJ's request, John A. Pella, M.D. reviewed the record and completed Medical Interrogatories Physical Impairments. R. 503–11. The ALJ asked Dr. Pella to consider the primary issue of whether Jennifer's "conditions, including her narcolepsy, would likely cause her to be off-task for extended periods of time beyond employer tolerances." R. 502. Dr. Pella indicated that Jennifer could perform a limited range of light work, with postural, manipulative, and environmental limitations due to fatigue and myalgias, and recommended workplace adjustments of a "later starting time[and] more stimulative tasking rather than

6

repetitive same tasking." R. 505, 506–11. The ALJ found Dr. Pella's opinion partially persuasive. R. 27.

Likewise, the ALJ asked Michael A. Lace, Ph.D. to complete Medical Interrogatories Mental Impairments. On March 12, 2020, Dr. Lace reviewed the record and found that the evidence supported diagnoses of adjustment disorder (or equivalent) and unspecified anxiety disorder, both situationally induced. R. 513. Dr. Lace found Jennifer had mild limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. R. 514. The ALJ found Dr. Lace's opinions partially persuasive. R. 27.

**B. Physical RFC and Function-by-Function Analysis**

Jennifer argues that the ALJ's physical RFC findings are not supported by substantial evidence, specifically regarding her ability to perform medium work and her excessive daytime sleepiness. In support, Jennifer contends that the ALJ failed to explain his consideration of Dr. Pella's opinion and minimized her daytime sleepiness, including by wrongly concluding her narcolepsy had improved with medication by April 2019 and failing to explain how the RFC limitations of a later starting time or shift work accommodate her daytime sleepiness.

A function-by-function analysis requires the ALJ to develop an adequate RFC which accounts for the work activities the claimant can perform given the physical or mental impairments affecting his ability to work.  Importantly, the ALJ must explain the conclusions reached and explain any record evidence which contradicts the RFC determination. See SSR 96-8p; see also Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that an ALJ needs to provide an explicit explanation linking medical evidence listed in the decision to his ultimate findings). The ALJ is instructed to cite specific medical facts and non-medical evidence

7

supporting his conclusion, discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis, describe the maximum amount of each work-related activity the individual can perform, and explain how any material inconsistencies or ambiguities in the evidence were considered and resolved. SSR 96-8p, 1996 WL 374184, at *7.

In Mascio v. Colvin, the court rejected a "per se rule requiring remand when the ALJ does not perform an explicit function-by-function analysis," agreeing instead with the Second Circuit that "'[r]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.'" Mascio, 780 F.3d at 636 (citing Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). "The Mascio Court held remand was necessary, in part, because the ALJ failed to indicate the weight given to two residual functional capacity assessments which contained relevant conflicting evidence regarding the claimant's weight lifting abilities." Newcomb v. Colvin, No. 2:14–CV–76, 2015 WL 1954541, at *3 (N.D.W. Va. Apr. 29, 2015).

Here, the ALJ's decision includes the narrative discussion required by SSR 96-8p, and contains sufficient information to allow meaningful review. Unlike the ALJ in Mascio, the ALJ in this case did not fail to consider conflicting medical evidence. Further, the court is "not left to guess about how the ALJ arrived at his conclusions" because the ALJ's findings include a comprehensive analysis of Jennifer's medical records, the medical opinions, Jennifer's hearing testimony from two hearings, and the ALJ's conclusions.

Contrary to Jennifer's argument that the ALJ "failed to explain why he did not adopt Dr. Pella's opinions that [Jennifer] is limited to light work," the ALJ specifically explained that the

8

evidence of record does not support Dr. Pella's rationale to limit her to light work because of myalgia, pointing to her physical exams as follows:

> Physical examinations consistently showed tenderness in the musculoskeletal system, but also revealed normal gait and station, normal strength, sensation, and reflexes, and normal movement of all extremities without edema, bony abnormalities, or acute distress.

R. 28. The ALJ also noted that Dr. Pella did not point to objective medical evidence, such as physical examination or imaging to support his limitation to light work.[8] Id. Indeed, the state agency doctors, whom the ALJ also found partially persuasive, found Jennifer had no exertional or postural limitations, though she should avoid exposure to hazards due to her narcolepsy. R. 98, 113.

The ALJ acknowledged Jennifer's daytime sleepiness and found her narcolepsy a severe impairment. Jennifer's statement that the ALJ "concluded her narcolepsy improved with medication by April 2019" is found nowhere in the ALJ's opinion. Pl.'s Br. at 14, Dkt. 15. Instead, the ALJ accurately notes that, "With respect to [Jennifer's] narcolepsy, [she] has reported some improvement with medication," citing to records from October 2018 and July 2020. R. 26, 384, 527. Indeed, the medical records Jennifer cites to support her argument were acknowledged by the ALJ. Specifically, the ALJ noted that Jennifer reported her condition fluctuated at an appointment in October 2019 (R. 25, 26), the ALJ also noted Jennifer's reports to Dr. Elechi that Xyrem caused odd leg symptoms and Adderall was less effective (R. 25), and that she was still experiencing excessive daytime sleepiness in April and July 2020, though she reported partial relief with Adderall by July (R. 25). Additionally, the ALJ explained that Jennifer saw her neurologist only 2 to 3 times a year subsequent to her alleged onset date, and also "worked for years with her daytime fatigue and sleepiness." R. 26.

---

[8] The ALJ also noted that certain jobs provided by the vocational expert, laundry sorter, ticket taker, were at the light exertional level, which would fall within Dr. Pella's opinions. R. 31.

Finally, the ALJ adequately explains how the RFC limitations suggested by Dr. Pella, limiting Jennifer to a later start time or shift work, accommodate Jennifer's daytime sleepiness. The ALJ explained that the evidence was generally consistent with Dr. Pella's opinion that a later start time and stimulating, rather than repetitive, "same tasking" all shift work should be considered, citing to the record for examples. These included that in April 2019 Jennifer "noted that her sleepiness got better by about one in the afternoon,[9]" that by October 2019, Jennifer "reported that her condition fluctuated" with less sleepiness on some days, and that Jennifer had, had a good response to Xyrem, with some side effects, and did not suffer from cataplexy, sleep paralysis, or hallucinations. R. 27. Likewise, none of the doctors in the record indicated that Jennifer could not work due to her narcolepsy. Accordingly, I recommend finding that substantial evidence supports the ALJ's RFC determination.

**C. Mental Impairments under SSR 96-8P**

Jennifer argues that the ALJ failed to properly assess her mental impairments as required by SSR 96-8P.  See Titles II & Xvi: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996). Specifically, Jennifer asserts that the ALJ failed to explain how his RFC findings account for her moderate limitations in concentration, persistence, or pace.[10] Jennifer also takes issue with the three jobs provided by the vocational expert, arguing that the vocational expert's testimony was "speculative," and the jobs suggested are incompatible with the RFC limitations.

---

[9] Two of the jobs suggested by the vocational expert, ticket taker and brewery worker, can have start times at 3:30 p.m. or later. R. 53.

[10] Jennifer also mistakenly states that the ALJ failed to "properly consider" her "moderate limitations in social functioning"; however, the ALJ found only mild limitations in interacting with others. Pl.'s Br. At 17, Dkt. 15; R. 22.

SSR 96-8P requires the ALJ to include a narrative discussion describing how the evidence supports his conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754, at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8P at *7; Meadows v. Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24, 2012 WL 3542536, at *8 (W.D. Va. Aug. 15, 2012) (citing Davis v. Astrue, No. 9-cv-2545, 2010 U.S. Dist. LEXIS 132972, at *15-16, 2010 WL 5237850, at *5 (D. Md. Dec. 15, 2010)); Monroe, 826 F.3d at 189 (emphasizing that the ALJ must "build an accurate and logical bridge from the evidence to his conclusion" and holding that remand was appropriate when the ALJ failed to make "specific findings" about whether the claimant's limitations would cause him to experience his claimed symptoms during work and if so, how often).

In Shinaberry v. Saul, the Fourth Circuit clarifies that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" Shinaberry v. Saul, 952 F.3d 113, 121 (4th Cir. 2020) (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). However, Mascio does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Id. In contrast, Shinaberry highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." Id. (quoting Winschel v. Comm'r of Soc.

11

Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). Shinaberry further confirms that Mascio does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC, but instead underscores the ALJ's duty to adequately review the evidence and explain the decision. See also Monroe, 826 F.3d 176 (emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

    Here, the ALJ explained why Jennifer's moderate limitations in concentration, persistence, or pace did not translate into a limitation in the RFC beyond that imposed.[11] Addressing Jennifer's an ability to sustain work over the course of a workday, the ALJ specifically noted that the area of concentrating, persisting, or maintaining pace includes an ability to "focus attention on work activities and stay on task at a sustained rate," as well as sustaining regular attendance and working a full day without extra rest periods. R. 22. The ALJ acknowledged Jennifer's reports of difficulty with concentrating and completing tasks, including that she could pay attention for 2–3 minutes only and that her fatigue caused issues with focus, such as brain fog and forgetfulness. R. 22, 25. In fact, despite Dr. Lace's finding that Jennifer had only mild limitations in concentration, persistence, or pace, the ALJ gave Jennifer "the benefit of the doubt with respect to her symptoms" and included additional restrictions to accommodate moderate limitations in concentration, persistence, or pace, in the RFC. R. 28. However, the ALJ also noted that on exam, doctors often found normal memory, and good insight and judgment, above average cognitive functioning, as well as focused attention and concentration during an interview with her doctor. R. 21–22 Contrary to Jennifer's argument, the

---

[11] Jennifer also argues that the ALJ failed to provide appropriate questions to the vocational expert. However, the ALJ's hypothetical questions were clear and with support in the record. At bottom, I find the ALJ's RFC findings were supported by substantial evidence and the ALJ presented an appropriate question to the vocational expert.

ALJ explained his reasoning and the RFC, including specific references to the medical records and opinions. The ALJ explained that because the record shows difficulty in concentration, persistence, or pace Jennifer has been limited to jobs without production rate or pace work, which he defined as no assembly-line type work or other work with strict daily quotas. R. 24, 27.

Jennifer also argues that the vocational expert's testimony regarding the start times for the three jobs was speculative and the jobs are excluded by the RFC; however, the vocational expert addressed these issues at the hearing and the ALJ properly relied on the vocational expert's testimony. At the hearing, the vocational expert responded to the ALJ's request to consider a shift work job, including work with variable start times, such as 10:00 a.m., noon, or 4:00 p.m., asking "[w]ould you be able to identify any work that would accommodate someone, you know, again coming in later . . . ?" R. 53. The vocational expert testified that a laundry sorter in a motel could start around 10:00 or 11:00, a ticket taker could start at 4:00 p.m., and a brewery worker could also start at 3:30 p.m. or 4:00 p.m. R. 53–54. The vocational expert specifically clarified that his testimony pertaining to late starts and shift-work are not in the Dictionary of Occupational Titles, but instead are based on his opinion as a vocational expert with over 30 years of experience. R. 55.

Likewise, counsel now questions whether the jobs offered by the vocational expert actually involved "same tasking," inconsistent with the RFC provided by the ALJ. Jennifer does not anchor her argument in the Dictionary of Occupational Titles, but instead simply reasons that a ticket taker requires "same tasking" because "the individual is required to stand and take tickets during the entire work shift" and laundry worker and brewer worker both "require plaintiff to perform the same tasks with a certain period of time (folding laundry and checking gauges). . . ." Pl.s' Br. At 19, Dkt. 15. However, the ALJ defined what he meant by "same tasking" at the

hearing, and the vocational expert provided jobs that met the criteria, leaving no confusion. The ALJ noted that this portion of the RFC came from the interrogatories he sent to doctors after the first hearing, to try to understand what he acknowledged to be a unique and unusual case (R. 88) and stated:

> [T]his is from the interrogatories. I'll read what is says and I'll try to define it. 'Something more stimulating tasking rather than just repetitive, same tasking.' So whether its just, you know, putting a screw in a hole over and over again, if that's the only thing you do, you know, one- or two-step tasks all day long and that's the only thing you do with no variation at all, we need to eliminate those types of jobs.

R. 51–52. Thus, the ALJ defined "same tasking" for the vocational expert, explaining that jobs with one to two step tasks would be eliminated. In turn, the vocational expert supplied jobs all containing reasoning level two, which requires workers to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." See DOT 344.667-010, Ticket Taker; DOT 522.685-014, Brewery Cellar Worker; DOT 361.687-014, Classifier. In contrast, the vocational expert did not supply jobs containing reasoning level one, which very well might have conflicted with the RFC, as reasoning level one requires workers to "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." See e.g. DOT 402.687-014 Harvest Worker, Vegetable. Accordingly, I find that the ALJ adequately explained the RFC, including what he meant by "same tasking," enabling the vocational expert to supply jobs that did not conflict with the RFC.

### D. Subjective Allegations

Jennifer argues that the ALJ's assessment of his allegations is not supported by substantial evidence. Jennifer claims that the ALJ mischaracterized the severity of her narcolepsy

14

and ignored her testimony, including regarding her previous employment and work attempts, as well as the extent of her ability to perform her daily activities.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).[12] First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[13] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

---

[12] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20 C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

[13] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

First, despite Jennifer's claim to the contrary, and as discussed above the ALJ never wrote that Jennifer's "narcolepsy improved with medication by April 2019." Pl.'s Br. At 23, Dkt. 15. On the page Jennifer cites, the ALJ instead wrote, accurately, that, regarding her narcolepsy, Jennifer has reported some improvement with medication. The ALJ never claimed Jennifer's narcolopsy improved by April 2019; in fact, the ALJ wrote in the same paragraph that in October 2019 Jennifer's narcolepsy condition was fluctuating (R. 26), and wrote elsewhere that in October 2020 Jennifer reported "poor nocturnal sleep with excessive daytime sleepiness" and in July 2020 reported only "partial relief of her daytime sleepiness with Adderall." R. 25.

Here, the ALJ acknowledged that Jennifer's case is unique, even sending out additional medical interrogatories, both mental and physical, and holding two hearings, in an attempt to obtain all the necessary information to make a decision on disability. Regarding testimony Jennifer claims the ALJ ignored, the ALJ's opinion includes an accurate discussion of Jennifer's medical history, along with Jennifer's own allegations, and the ALJ adequately supported his finding that Jennifer's allegations were not entirely consistent with the medical evidence and other evidence in the record. Specifically, the ALJ acknowledged Jennifer's testimony that at the end of her last job she "was taking 35–45 minutes to accomplish tasks that should take 10 minutes" (R. 24) but also noted that she "worked for years with her daytime fatigue and sleepiness" and did not stop working due to her conditions, but instead was laid off after the person she was working for retired. R. 27.

Jennifer points to Brown v. Comm'r, 873 F.3d 251 (4th Cir. 2017) and similar cases to support her argument that the ALJ failed to acknowledge that "the activities [such as doing laundry and driving] cited by the ALJ are performed intermittently or with assistance from [her] husband." Pl.'s Br. At 25, Dkt. 15. Jennifer emphasizes her testimony that she hires someone to

16

clean her house, and drives no more than five miles, as well as statements from her function report regarding her limited activities. However, the ALJ acknowledged Jennifer's hearing testimony, including that she "has two days per week where she is completely out of it," experiences brain fog and forgetfulness, and "falls asleep at all times," and did not overstate her abilities as set forth in the function report. R. 25. Further, unlike in Brown, the ALJ pointed to more than Jennifer's daily activities to discount her subjective allegations.[14] Beyond activities of daily living, the ALJ noted that medical evidence was "inconsistent with [Jennifer's] allegations about the debilitating nature of her impairments." R. 25. Jennifer's allegations of disability were also inconsistent with the state agency doctors, and Drs. Pella and Lace, who all found her capable of working. Finally, the ALJ may properly rely on evidence regarding a plaintiff's routine, non-work activities in rejecting a claim of disability. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005).

It is for the ALJ to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of Jennifer's subjective complaints with substantial evidence, and that Jennifer is capable of performing work at the level stated in the ALJ's opinion.

---

[14] Also, unlike in Brown, the ALJ here did not fail to consider any doctor's opinions, or wrongly credit a psychiatric medical expert's testimony over the "consistent opinions of [five] treating and examining sources" who found disabling physical limitations. Brown, 873 F.3d at 266.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Elizabeth K. Dillon, United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.  Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days.  Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

Entered:  June 1, 2022

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge